71 So.2d 79

**HARALSON v. STATE ex rel. KING et al.**

**7 Div. 211.**

Supreme Court of Alabama.

Oct. 29, 1953.

Rehearing Denied March 18, 1954.

C. A. Wolfes, Leonard Crawford, Fort Payne, for appellant.

Chas. J. Scott and W. M. Beck, Fort Payne, for appellees.

Si Garrett, Atty. Gen., and Bernard F. Sykes, Asst. Atty. Gen., amici curiae, in support of appeal.

LIVINGSTON, Chief Justice.

Quo warranto to determine the right of Henry Haralson, the duly elected Mayor of Fort Payne, Alabama, to sit with the Council of said city and vote in its proceedings. Haralson was elected Mayor of Fort Payne in a municipal election held on September 15, 1952.

Section 404, Title 37, of the 1940 Code of Alabama, provides:

"In all cities and towns at the general election to be held on the third Monday in September, 1940, and quadrennially thereafter, there shall be elected a mayor, who, in cities having a population of six thousand or more, according to the last or any subsequent federal census, shall not sit with the council, nor have a vote in its proceedings, and he shall have the power and duties herein conferred. In all cities and towns having a population of less than six thousand inhabitants according to the last or any subsequent federal census, the legislative functions shall be exercised by the mayor and five aldermen. The mayor shall preside over all deliberations of the council. At his discretion he may vote as a member of the council on any question coming to a vote, except in case of a tie, in which event he must vote. The aldermen in such municipalities shall be

elected by the city or town at large, at the first general election held on the third Monday in September, 1940, and quadrennially thereafter or from wards as the said councils may determine, not less than six months before an election."

The sole question involved in this appeal is: When did the 1950 Federal Decennial Census become effective as a reclassification date as provided for in Title 1, Section 14 of the Alabama Code of 1940, as amended by Act No. 174, General and Local Acts 1951, p. 415, approved June 29, 1951?

As amended, Section 14, Title 1, Code, reads as follows:

"Reclassification date.—The ninetieth day after the first day of the first regular legislative session held next after the publication by the federal government of the regular federal decennial population census for Alabama is hereby fixed as the date for any reclassification under any law requiring classification based on such said census. *The provisions of the preceding sentence shall not apply to any law passed by the 1951 regular session of the legislature of Alabama. The provisions of this section shall not apply to any law which provides for the levying or collection of license taxes on a population basis or the distribution of state and county collected or administered revenues or funds on a population basis; and the population as disclosed by any federal decennial census, as soon as the same is proclaimed, published or certified by the director of the United States census bureau, shall be used in administering any such law.*" (Emphasis supplied.)

The italicized provisions of Section 14 were added by the 1951 Amendment.

It is undisputed that the population of Fort Payne was 4,424 according to the Federal Decennial Census of 1940, and 6,226 according to the 1950 Federal Decennial Census. All parties agree that if the 1950 Federal Decennial Census was in effect, as relates to the reclassification laws of Alabama, Sec. 14, Title 1, as amended, Code, on Sep-

tember 15, 1952, the date on which Haralson was elected Mayor of Fort Payne, then the City of Fort Payne was on that date a city of more than 6,000 population and Haralson would have no right to sit with the city council or to vote in its proceedings. The trial court held that the 1950 Census was so in effect.

It is clear enough that Sec. 14, Title 1, supra, both before and after its amendment by Act No. 174, appvd. June 29, 1951, was intended by the legislature to afford a definite ascertainable date, which would be known by all concerned, and upon which reclassification according to population would become effective. It is equally clear that reclassification within the state must take place within the state as a whole and not by piecemeal.

It is also quite clear that if the 1950 Federal Decennial Census was not published prior to the first day of the regular session of the 1951 Legislature, then, under the first sentence of Sec. 14, Title 1, supra, the population basis of Fort Payne had not changed from the 1940 Census figures and could not change until the ninetieth day after the first day of the regular legislative session of 1953.

The judgment of the court below is to the effect that, as of September 15, 1952, the population of Fort Payne was more than 6,000, according to the legislative intent as expressed in Title 1, Sec. 14, supra.

The question of paramount importance in this case, in fact, the sole question, is one of legislative intent. What did the Legislature of Alabama intend, as to the reclassification date here involved under the undisputed facts in this case, by re-enacting, on June 29, 1951, the first sentence of Sec. 14, Title 1, supra, and adding thereto, by amendment, the italicized part of said section? There is no sort of doubt as to legislative authority for fixing a reclassification date based upon the Federal Decennial Census.

Appellees introduced as evidence a certificate of Roy V. Peel, Director of the Bureau of Census, to the effect that as of April 1,

1950, the population of the City of Fort Payne was 6,226. This certificate was dated November 25, 1952, and is Exhibit No. 1 for plaintiff.

Appellees then introduced as evidence another such certificate from the Department of Commerce, Bureau of Census, Washington, D. C., dated January 27, 1953. It also was certified by Roy V. Peel, Director of the Bureau of Census, as to the population of the State of Alabama, as of April 1, 1950. Attached thereto is a document entitled "1950 Census of Population-Advance Reports" (for Alabama), bearing the date of October 4, 1951. The population figures therein contained are stated to be the "final figures for the State released today" (October 4, 1951) "by Roy V. Peel, Director, Bureau of the Census, Department of Commerce." Said certificate and document were received as Plaintiff's Exhibit No. 2.

Appellees also introduced as evidence a printed document, not certified to by any official, entitled "1950 Census of Population-Preliminary Counts" (for Alabama), dated August 15, 1950, wherein it is stated that the figures in this report are only preliminary counts of population as compiled in field offices. Said document was designated as Plaintiff's Exhibit No. 3. Upon objection of appellant, this document was not admitted as evidence, inasmuch as it was not authenticated by any proper official or custodian. The court, however, stated that it would be allowed for the purpose of showing that the government issued other bulletins.

Appellant introduced as evidence documents showing the official count (for Alabama) of the 17th Census of the United States on file in the Bureau of Census, certified by Roy V. Peel, Director of the Bureau of Census, said certificate bearing date of September 11, 1951. Attached to these documents was the certification of Mrs. Agnes Baggett, Secretary of State of Alabama, stating that the said official count of the 17th Census had been filed in the office of the Secretary of State of Alabama, as certified to the Governor of Alabama, under date of September 11, 1951, by Roy V. Peel, as Director of the Census. These attached documents were admitted in evidence as Defendant's Exhibit A.

Act No. 174, Gen. & Lo. Acts 1951, was approved on June 29, 1951, some two months after the legislature had convened in regular session in May of 1951. Prior to June 29, 1951, the Bureau of the Census was in process of taking the census and compiling its reports. We see from the evidence offered that as early as August 15, 1950, the Census Bureau issued a bulletin showing the "preliminary count of the returns of the 1950 Decennial Census for Alabama." The bulletin dated August 15, 1950, does not even purport to be final or conclusive. Prior to June 29, 1951, in addition to the bulletin dated August 15, 1950, there were other bulletins showing preliminaries and estimates of what the final census in Alabama would be. The legislature had knowledge of that fact on and prior to June 29, 1951, the date it amended the reclassification statute—that the census was not complete but that preliminary figures were available. It, therefore, amended Title 1, Sec. 14, which then provided:

"§ 14. Reclassification date.—The ninetieth day after the first day of the first regular legislative session held next after the publication by the federal government of the regular federal decennial-population census for Alabama is hereby fixed as the date for any reclassification under any law requiring classification based on such said census."

by adding:

"The provisions of the preceding sentence shall not apply to any law passed by the 1951 regular session of the legislature of Alabama. The provisions of this section shall not apply to any law which provides for the levying or collection of license taxes on a population basis or the distribution of state and county collected or administered revenues or funds on a population basis; and the population as disclosed by any federal decennial census, as soon as the same is proclaimed, published or certified by the director of the United States census bureau, shall be used in administering any such law."

What was the necessity or cause for the legislature to add these two sentences to Title 1, Sec. 14, supra? This court can take into consideration the history of the enactment and the contemporary circumstances surrounding its enactment. City of Birmingham v. Hendrix, 257 Ala. 300, 58 So.2d 626; In re Upshaw, 247 Ala. 221, 23 So.2d 861; Cole v. Gullatt, 241 Ala. 669, 4 So.2d 412; Board of Education of Jefferson County v. State, 239 Ala. 276, 194 So. 881; Storrs v. Heck, 238 Ala. 196, 190 So. 78; McCreless v. Tennessee Valley Bank, 208 Ala. 414, 94 So. 722; State ex rel. City of Birmingham v. Board of Revenue of Jefferson County, 201 Ala. 568, 78 So. 964; Davis v. State ex rel. County Board of Equalization of Cherokee Co., 16 Ala.App. 397, 78 So. 313; Prowell v. State ex rel. Hasty, 142 Ala. 80, 39 So. 164.

The contemporary circumstances surrounding the addition of the two sentences above were that the preliminary figures were being circulated by bulletin by the Federal Census Bureau. The final count had not been made as late as June 29, 1951. The legislature knew that the final, official, formal publication of the 1950 Census had not occurred prior to its then present session, and that said census could not become effective relative to a reclassification date until after the following legislative session, that of 1953.

The legislature did not change Title 1, Sec. 14, insofar as most of our laws are concerned, but made two exceptions: (1) laws passed during the 1951 session, and (2) laws providing for the levying or collection of license taxes on a population basis, or the distribution of state and county collected or administered revenues or funds on a population basis. As to the last two enumerated types of laws, the legislature provided that there must be a reclassification *"as soon as the same is proclaimed, published or certified"*. (Emphasis supplied.) The words "as soon as" elucidate the fact that the legislature was well aware in June of 1951 that there had been no "publication" of the census within the meaning of the first sentence of Title 1, Sec. 14, supra. The fact that the legislature used the phraseology "reg-

ular federal decennial population census" also buttresses the argument that the Legislature of Alabama had never intended that the reclassification date of this state should be determined upon the issuance of mere preliminary, inconclusive, partial returns from the federal government. Without a doubt, the legislature in authorizing reclassification as soon as the census was proclaimed, published or certified, intended to speed the process of reclassification in respect to the 1951 laws, and laws relating to the collection and distribution of revenues on a population basis. The legislature was not satisfied to wait until after the 1953 session for a reclassification as to those two types of laws, but it was ready to wait for a reclassification until 1953 as to all other types of laws.

The laws here under consideration, Title 37, Secs. 404 and 426, supra, allowing the mayor to sit and vote with the council meeting in towns of under 6,000 population, are types of laws for which the legislature was satisfied to wait until the regular reclassification date according to the first sentence of Title 1, Sec. 14, supra, or until August of 1953. Furthermore, by the use of the words "proclaimed, published or certified", in the last sentence of the amendment, the legislature indicated that as to the two exceptions (1951 laws and laws relating to the collection and distribution of revenues on a population basis), there need be no conclusive, formal, regular "publication" of the census as required by the first sentence of Title 1, Sec. 14, supra. Nothing can be more evident from the June 29, 1951 amendment than the fact that the legislature knew that the publication of the Federal Census as used in Title 1, Sec. 14, before amendment, meant a regular, formal, official, final publication.

It is also evident that as to the two exceptions the legislature intended to allow preliminary census figures to govern the reclassification date in respect to two types of laws. This court feels that it must, and has taken into consideration, the presumed legislative intent and construction as relates to Title 1, Sec. 14, supra. We have investigated the history and contemporary circum-

stances surrounding its enactment. See City of Birmingham v. Hendrix, 257 Ala. 300, 58 So.2d 626; Board of Education of Jefferson County v. State, 239 Ala. 276, 194 So. 881; J. R. Raible Co. v. State Tax Commission, 29 Ala.App. 184, 194 So. 556.

■ Another rule of statutory construction demonstrates the futility of the argument of appellees. Appellees contend that the 1950 Census was "published" within the meaning of Title 1, Sec. 14, supra, prior to the May, 1951 Session of the Legislature. If such be true, then what was the meaning or effect of the amendment of June 29, 1951, to Title 1, Sec. 14, supra? Surely the legislature wasn't wasting its time and effort in considering and passing the amendment. As a general rule of statutory construction, courts will attempt to give some meaning to a statute passed by the legislature. See McDonald v. State, 32 Ala.App. 606, 28 So. 2d 805. We should not hold that the legislature has done a vain and useless thing. We must give some meaning to the amendment. If the Federal Decennial Census had been "published" within the meaning of Title 1, Sec. 14, supra, prior to the May, 1951 Session of the Legislature, then Title 1, Sec. 14, before amendment, would have been sufficient to require that laws passed during the 1951 Session be governed by the 1950 Census. Similarly, laws relating to the collection or levying on a population basis would, without amendment to Title 1, Sec. 14, supra, have been governed by the 1950 Census. This court cannot reach the illogical conclusion that the 1950 Census was "published," within the meaning of Title 1, Sec. 14, supra, prior to May, 1951. We cannot conclude that the Legislature of Alabama enacted a vain and useless amendment to Sec. 14, supra, in respect to two types of laws.

■ It is our conclusion, therefore, that the legislature interpreted and construed on June 29, 1951, that the term "publication" meant a final, formal, official publication; that that event had not taken place prior to May, 1951, and, further, that the preliminary counts then already issued by the federal government could be used in two types of laws only.

The law which we must consider is Title 37, Sec. 404, Code of 1940, which provides that mayors in towns having populations of less than 6,000 shall preside over the council and vote at his discretion. Obviously, this statute is not within the exceptions, and was among those statutes requiring a formal, final, official publication of the Federal Census before a reclassification of cities could take place. Title 37, Sec. 404, supra, definitely is not the type of statute referred to by the legislature in the two exceptions in the amendment to Title 1, Sec. 14, supra.

Coons v. Isbell, 222 Ala. 409, 132 So. 891, is not controlling authority, inasmuch as in that case, no statute similar to Title 1, Sec. 14, as amended, supra, was present.

The case of City of Detroit v. Nims, 330 Mich. 239, 47 N.W.2d 4, is one of the most recent cases dealing with the problem of reclassification dates, as determined through Federal Decennial Census Reports. There, many of the older cases concerning said problem are reviewed and commented upon by Justice Dethmers in a very thorough and well-reasoned opinion.

The cases of Underwood v. Hickman, 162 Tenn. 689, 39 S.W.2d 1034, and City of Twin Falls ex rel. Cannon v. Koehler, 63 Idaho 562, 123 P.2d 715, in which salary increases for public officials were held effective from the date as of which the enumerations were made, go to one extreme, while Commonwealth ex rel. Woodring v. Walter, 274 P. 553, 118 A. 510, and Lewis v. Lackawanna County, 200 Pa. 590, 50 A. 162, seem to be directly contra, under the theory that a legal ascertainment of the determinative facts must be shown. In the latter two cases, elected officials were denied salary increases because the date of the legal ascertainment of census results, showing a population warranting such increase, did not occur until after the officials' election. Supporting the latter two cases are Varble v. Whitecotton, 354 Mo. 570, 190 S.W.2d 244, which involved the selection of a jury as provided by statute, according to the last preceding Federal Census, and Childers v. Duvall, 69 Ark. 336, 63 S.W. 802, in which it was held that the appointment of a county clerk, permissible under the state consti-

tution when the county reached a certain population as shown by the last Federal Census, could be made only after the results of the census were officially announced by the director of census.

As stated in City of Detroit v. Nims, supra, [330 Mich. 239, 47 N.W.2d 7] a number of other cases may be grouped as follows:

"(1) Wolfe v. City of Moorhead, 98 Minn. 113, 107 N.W. 728; Broyles v. Mahaska County, 213 Iowa 345, 239 N.W. 1; State ex rel. Martin v. Ivins, 59 N.J.L. 364, 36 A. 93, and Buck v. Douglass, 74 N.J.L. 300, 65 A. 848, involving censuses established by state law, in which the courts found from some express provision in the statutes involved an indication of legislative intent as to what should be the effective date of the applicable census. In none of these was the effectiveness thereof held to relate back to the date of enumeration. (2) Holcomb v. Spikes, Tex. Civ.App., 232 S.W. 891, involving the question of when a county became entitled, under the state constitution, by reason of the attainment of a specified population according to the last federal census to elect a county tax collector; Garrett v. Anderson, Tex.Civ.App., 144 S.W.2d 971, involving the question of when the court might exercise the right to reduce the salary of its reporter which was by statute made dependent upon the county reaching a certain population according to the last federal census. Herndon v. Excise Board of Garfield County, 147 Okl. 126, 295 P. 223, involving the question of when a new court might be created on the basis of achievement by the county of a certain population according to the last federal census; Board of Commissioners of Coal County v. Mathews, 147 Okl. 296, 296 P. 481, involving the amount of the salary of a public official; Elliott v. State ex rel. Kirpatrick, 150 Okl. 275, 1 P.2d 370, involving the number of justices of the peace to be elected in a city; * * *. In this group of cases figures from preliminary results, reports or bulletins were accepted by the courts and the changed population statuses of the units involved were held in effect as of the date of such reports. To this group might be added Forde v. Owens, 160 S.C. 168, 158 S.E. 147, in which the changed population status was held operative as of the date of a newspaper account of census results, and State v. Braskamp, 87 Iowa 588, 54 N.W. 532, in which a new population status was held in effect as of the date when the census results became a matter of public notoriety. The Forde Case involved the power of a city to adopt the commission form of government and the Braskamp Case the propriety of a grand jury drawing. In none of the cases in this group was it held that the changed population status related back, for the purposes specified in the statutes or constitutional provisions involved, to the date of enumeration."

Despite the great lack of uniformity in the decisions, the observation may be drawn from the cited cases that, *when ascertainable, legislative intent is the guiding star*. Our decision that the 1950 Federal Decennial Census was not "published" prior to the May, 1951 Session of the Legislature, as required by Title 1, Sec. 14, as amended, supra, is in complete accord with the reasoning and conclusions of the court of City of Detroit v. Nims, 330 Mich. 239, 47 N.W. 2d 4, 7. Though the Michigan Court held that distributions and the reclassification date should be determined, *according to the Michigan Statute and Constitution,* on the basis of preliminary 1950 Census bulletins, we feel that our opinion is not in disagreement or contra to any conclusion of said case. There, the facts were different, and of more importance; the Michigan statute and Constitution are entirely different from those we must interpret and apply in Alabama. Our conclusion is fully supported by the following statements of the Michigan Court:

"We emphatically do not decide in this case the meaning of terms employed in statutes not involved in this case. The controlling question here

may not be so narrowly stated as to be simply, 'At what date can it be said there is a new federal decennial census?', but, rather, our inquiry must be, 'What did the people mean, in adopting article 10, § 23, by the provision that the return of sales tax moneys to local units shall be on a population basis and that the computation of such population shall be based on the last state-wide federal census?' "

There, the statutory provisions for the use not only of the latest federal state-wide or decennial census, but also of any later special federal county-wide census for distribution within a county clearly disclose the intent that distributions should be made on a basis as nearly in accord with actual population as possible. No similar provisions must be referred to in this case. In short, constitutional and legislative intent must be the controlling factors.

City of Nashville v. Kizer, Tenn.Sup., 250 S.W.2d 562, is another recent decision involving the issue at hand. It, however, in our opinion, only follows the older holding of Underwood v. Hickman, 162 Tenn. 689, 39 S.W.2d 1034, and is not exactly in full accord with the better reasoning of City of Detroit v. Nims, supra, which we prefer. Furthermore, both the factual situation and the Tennessee statute in City of Nashville v. Kizer, supra, definitely differ from those found in this case. In short, except for the portion of the opinion which discusses the importance of legislative intent, City of Nashville v. Kizer, supra, is of little aid, if any, in helping us determine the true meaning and construction intended by the Legislature of Alabama, when it amended Title 1, Sec. 14, supra, on June 29, 1951.

■ Having examined the evidence submitted on the trial of this cause, it is found that there was no final, formal announcement of the 1950 Federal Decennial Census prior to the 1951 Session of the Legislature, but only preliminary figures. Attached to the certificate of the Director of the Bureau of the Census, dated January 27, 1953, is a bulletin dated October 4, 1951, the latter date being after the May Session of the 1951

Legislature. Said bulletin states that the figures therein are "final figures for the State released today (October 4, 1951)." If this statement in the bulletin is true, then the reclassification date could not occur until ninety days after the first day of the following legislative session, that of 1953.

The certificate of the Director of the Bureau of Census, dated November 25, 1952, indicates that as of April 1, 1950, the City of Fort Payne had a population of 6,226. This is not to say that these figures were "published" within the meaning of Title 1, Sec. 14, as amended, supra, prior to May, 1951. All said certificate shows is that the Director of the Bureau of the Census formally published the population of Fort Payne on November 25, 1952, which was not in time for a reclassification date in August, 1951.

The bulletin dated August 15, 1950, would not be mistaken by anyone as being a formal, final, conclusive publication of the census. It is labeled horizontally and vertically with the word "preliminary." It is a preliminary count of the returns of the 1950 Census. Said bulletin was one of those bulletins that were being circulated when the legislature amended Title 1, Sec. 14, on June 29, 1951. It was not considered by the Legislature of Alabama to be sufficient to cause reclassification or to be treated as the "regular federal decennial population census" as referred to in Title 1, Sec. 14, supra, before amendment. The bulletin may be a publication in the sense that it is printed or mimeographed and distributed, but it does not purport to be correct or final. The Legislature of Alabama did not intend that the government of a municipality of this state should be determined by the uncorrected, preliminary count of the Bureau of the Census.

The certificate of Agnes Baggett, Secretary of State of Alabama, under date of March 23, 1953, indicates that advance figures were released on September 11, 1951. The accompanying letter, dated September 11, 1951, from the Director of the Bureau of the Census to the Governor of Alabama indicates that even on that date, long after the May, 1951 Session of the Legislature

had begun, that the figures released were not for general publication, but were for the administrative use of the various state departments only. The letter from the Director, under date of September 11, 1951, indicates that it would then be approximately four weeks before the report was actually in print for final, formal publication.

In summary, therefore, the evidence offers a preliminary estimate of August, 1950, a certified copy of the final work sheets for Alabama, of September 11, 1951, and a bulletin, dated October 4, 1951, which shows the final figures released for the first time on that date.

 A federal tabulation or census has no force within a state except as provided by the Constitution or laws of the state. Commonwealth ex rel. Woodring v. Walter, 274 Pa. 553, 118 A. 510. Thus, the 1950 Federal Decennial Census can be applied to the reclassification laws of Alabama only in a manner which conforms with Title 1, Sec. 14, as amended, supra. Regardless of whether or not the court takes judicial notice of various bulletins or the actual census, it must also take judicial notice of whether the bulletins announce preliminary figures which are not final, or whether they purport to give a final, correct, official, conclusive figure.

Assignment of Errors numbered 4, 5, 6, 8, 9 and 10 are resolved in favor of appellant. Judgment is reversed. The Circuit Court of DeKalb County is hereby ordered to enter a decree in conformance with this decision.

Reversed and remanded.

LAWSON, STAKELY and MERRILL, JJ., concur.

On Application for Rehearing

LIVINGSTON, Chief Justice.

On original submission in this court, it was agreed, in substance, by all parties concerned that the only question involved in the law suit was the effective date of the 1950 Federal Decennial Census.

This question was undoubtedly clearly answered. On application for rehearing, petitioners asked this court to determine whether or not, since the reclassification date, in August 1953, the mayor has authority to sit and vote in the council as provided by Section 404, supra; and may he vote twice under his authority to vote as a member of the council on any question and again under his authority to break a tie vote under the authority of the same statute?

These questions were raised for the first time on application for rehearing. They were not presented to the court below, nor on original submission; therefore, we decline to answer them. See Beasley v. Beasley, 248 Ala. 690, 29 So.2d 232; White v. White, 33 Ala.App. 403, 34 So.2d 182; Edwards Ins. Agency v. Jones, 242 Ala. 624, 7 So.2d 567; Penn Mutual Life Insurance Co. v. State, 223 Ala. 332, 135 So. 346.

Application for rehearing is overruled.